# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of: | ) |
| | ) |
| The cellular phone assigned telephone number **(920) 988-2231**, with service provided by U.S. Cellular, and used by Scott Hoeft of Watertown, Wisconsin. | ) Case No. 18-M-175 |
| | ) |
| | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United States Code, Sections 1591, 1594, 1952, and 1956.

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI Special Agent Heather Wright
*Printed Name and Title*

Sworn to before me and signed in my presence:

Date: Nov. 6, 2018

_____
*Judge's signature*

City and State: Milwaukee, Wisconsin

Hon. David E. Jones                , U.S. Magistrate Judge
*Printed Name and Title*

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Heather Wright, being first duly sworn, hereby depose and state as follows:

## I.      Agent Background & Experience

1.      I am a Special Agent with the Federal Bureau of Investigation, and I have been so employed since July 2010.

2.      As part of my duties, I investigate the illegal trafficking of persons for commercial sex acts and other offenses related to human trafficking. I have gained experience in the conduct of such investigations through prior investigations, formal training, and in consultation with law enforcement partners employed by local, state, and federal law enforcement agencies. Prior to my assignment with the Milwaukee Division of the FBI, I worked in the pharmaceutical manufacturing industry as a Programmer Analyst for web applications from September 1999 through March 2001 and an Automation Engineer from June 2003 through July 2010.

3.      The facts in this affidavit come from my personal observations, my training and experience, information obtained from citizen witnesses, and information reported to me by other law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.

4.      Throughout this affidavit, "case agents" refers to the federal, state, and local law enforcement officers who have participated directly in this investigation, and with whom I have had regular contact regarding this investigation. The case agents in this investigation have included law enforcement officers from the FBI, Dodge County Sheriff's Office (DCSO), Internal Revenue Service – Criminal Investigation, Department of Labor – Office of Inspector

General, Hartford Police Department (HPD), and Wisconsin Department of Justice, Division of

Criminal Investigation.

      5.     This affidavit is intended to show merely that there is sufficient probable cause

for the requested warrants and does not set forth all of my knowledge about this matter.

## II.    Purpose of Affidavit

      6.     I make this affidavit in support of applications for the following search warrants:

      a.     A warrant to search the premises known as **The Hardware Store, 942 Main Street, Clyman, Wisconsin**, more particularly described in Attachment A to that application.

      b.     A warrant to seize and search the cellular phones used by Michael Siegel, associated with telephone numbers **(920) 342-7532** and **(414) 870-7730**; and

      c.     A warrant to seize and search the cellular phone used by Scott Hoeft, associated with telephone number **(920) 988-2231**.

      7.     I also make this affidavit in support of applications for the search warrants under

18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A), requiring the following identified

entities to disclose, and authorizing the government to search, the information described below

and in Attachments A and B to each application:

      a.     A warrant requiring **Verizon Wireless** to disclose records and other information, including the contents of communications, associated with the phone number **(920) 342-7532**, stored at premises owned, maintained, controlled, or operated by Verizon Wireless, a company headquartered at 180 Washington Valley Road, Bedminster, New Jersey;

      b.     A warrant requiring **AT&T Mobility** to disclose records and other information, including the contents of communications, associated with the phone number **(414) 870-7730**, stored at premises owned, maintained, controlled, or operated by AT&T Mobility, a company headquartered at 11760 U.S. Highway 1, North Palm Beach, Florida; and

      c.     A warrant requiring **U.S. Cellular** to disclose records and other

2

information, including the contents of communications, associated with the phone number **(920) 988-2231**, stored at premises owned, maintained, controlled, or operated by U.S. Cellular, a company headquartered at 8410 Bryn Mawr Avenue, Suite 800, Chicago, Illinois.

8.      Based on the facts set forth in this affidavit, there is probable cause to believe that on the premises described in Paragraphs 6 & 7, there exists evidence of violations of Title 18, United States Code, Sections 1591 (sex trafficking), 1594 (conspiracy to engage in sex trafficking), 1952 (use of facility in interstate commerce to carry on or distribute the proceeds of prostitution activity unlawful under state law), and 1956 (money laundering), as described in Attachment B to each application.

**III.    Probable Cause**

**A.      Overview.**

9.      Case agents have been investigating Christopher Childs, Jennifer Campbell, and others for using force, fraud, and coercion to cause victims to engage in commercial sex acts. Childs currently is charged in Case No. 18-CR-69 (PP) with five counts of sex trafficking of adult victims by force, fraud, and coercion and one count of sex trafficking of a minor.  Childs and Campbell (who served as Childs' "bottom" prostitute) also are charged with one count of conspiracy to engage in sex trafficking.

10.      The investigation to date has revealed that many of Childs' sex trafficking activities took place in strip clubs located in Dodge County, Wisconsin, including the "Hardware Store" at 942 Main Street, Clyman, Wisconsin.

11.      The investigation to date has revealed that the managers and employees of the Hardware Store knew of, facilitated, and profited from sex trafficking offenses undertaken by Childs and other pimps at the club.

3

**B.     The Hardware Store.**

12.     Based on information from witnesses and records reviewed by case agents, I am aware that the Hardware Store is owned by Donald Raffaelli and Michael Siegel ("Siegel"). Raffaelli and Siegel also own Solomon's, a strip club in Juneau, Wisconsin. They own the clubs through various corporate entities, such Ceiling Ball LLC, 942 Main Street, Inc., 112 East Oak Street, Inc., and Back Wall LLC. Siegel used to work for Raffaelli at Rickey's on State, a strip club in Milwaukee.

13.     Siegel also served as the President of the Village of Clyman. In April 2018, after the Hardware Store received negative publicity following the March 29, 2018 arrest of Chris Childs for sex trafficking, Siegel resigned as Village President. From interaction with Siegel and information provided by witnesses, as well as from DCSO records, I am aware that Siegel has used two cellular phone numbers related to activity taking place at the Hardware Store, **(920) 342-7532** and **(414) 870-7730.** I am aware that the service provider for **(920) 342-7532** is Cellco Partnership LLP d/b/a Verizon Wireless and that the provider for **(414) 870-7730** is AT&T Mobility.

14.     At all times relevant to this affidavit, Siegel's brother, William Siegel ("Bill"), has worked at the Hardware Store as a manager and a bartender.

15.     Scott Hoeft (a/k/a Scotty or Scottie) worked at the club as a manager and a bartender. Siegel told law enforcement that he planned to fire Hoeft as of September 28, 2018. However, a GMC Terrain registered to Hoeft was parked in front of the Hardware Store when law enforcement passed by on October 2, 2018. From interaction with Hoeft and information provided by witnesses, as well as from DCSO records, case agents are aware that Hoeft is the listed subscriber for and has used the following cell phone number related to his work at the

4

Hardware Store: **(920) 988-2231**.  I also am aware that the service provider for this phone number is U.S. Cellular.

16.     Siegel's wife, Abigail Hageny ("Hageny"), also works at the Hardware Store. Initially, Hageny worked as a dancer.  After she started dating Siegel, she began tending bar and scheduling other dancers.  I am aware that Hageny is listed as the subscriber for one of Siegel's phone numbers, **(920) 342-7532**.

**C.     Information provided by Victim 1.**

17.     On May 16, 2017, Victim 1, an adult female, reported to HPD and the DCSO that Childs was forcing her to be involved in commercial sexual activity.  A short time later, Victim 1 made a statement about this conduct to me.  Victim 1 reported that between October 31, 2015, and May 15, 2017, Childs regularly forced or coerced her to perform prostitution dates, most often in the "champagne rooms" at the Hardware Store or another club in the area.  Victim 1 reported that Childs demanded that she give him all proceeds earned from prostitution dates and dancing at the strip clubs.

18.     Victim 1 described Childs' rules when working at the strip clubs and performing prostitution dates.  Victim 1 also described additional rules imposed by Childs that governed nearly every aspect of Victim 1's life.  Victim 1 described physical punishments that Childs inflicted or threatened for violating these rules, including beating her, making her sleep on the bathroom floor, choking her during oral sex until she vomited, and forcing her to insert painful objects into her vagina, such as a hot curling iron.

19.     Victim 1 explained that at the end of every night, Childs required her to bring him all of the money that she had made. Initially, Victim 1 had to drop the money off at Childs' residence every night on the way home from the Hardware Store or the other club. The club

5

managers would provide payment to Victim 1 in a sealed envelope. Later, Childs installed a safe in Victim 1's home, and Victim 1 was to lock the envelope inside the safe. If there were any discrepancies as to how much money should be inside the envelope, Childs would call the club managers to verify how many times Victim 1, and other women working for Childs, had entered the champagne room. Law enforcement later verified and documented the existence of this safe.

20.     Victim 1 stated that the owner and managers of the Hardware Store were aware that Victim 1 and others were working for a pimp. According to Victim 1, the owners and managers of the clubs preferred to hire dancers with pimps because they would work any shifts required of them, show up on time, and bring in additional high-spending clientele, who wanted to buy sex in the champagne rooms. Dancers with pimps generally had a greater motivation to earn as much money as they could because of their pimps' demands, and the club profited from this arrangement because they took a cut from each champagne room service. The club owners and managers also knew that they could call Childs if they had any problems with the women working for him and that Childs would deal with them right away.

21.     Victim 1 stated that she worked at the Hardware Store from Monday through Saturday for approximately 6 months. She explained that there is no security and described the atmosphere as a "free for all." Victim 1 gave an example of an incident in which a customer in one of the "champagne rooms" had pinned her to a wall, ripped off her clothes, and took out his penis. Victim 1 stated that as a "trick of the trade," she had hidden a knife in her hair and had to pull the knife to ward off the customer. The customer was kicked out of the club but later allowed to return. Victim 1 identified some of her regular prostitution customers at the club and stated that she often earned $3,000 to $4,000 per week at the Hardware Store.

6

22.     Victim 1 stated that the bartenders at the Hardware Store are able to flick the lights off and on in the champagne rooms to warn of police presence. Victim 1 identified the usual bartenders as Abigail Hageny, Bill Siegel, Scott Hoeft, "Josh," and "Smokey."

23.     Victim 1 further explained that Childs made her sell cocaine at the Hardware Store and that she stored the cocaine in a "Hello Kitty" lunchbox. Victim 1 stated that Childs made her use the code phrase "lunch box" to refer to drugs.

24.     Victim 1 stated that dancers were required to pay the Hardware Store bartenders a "house fee" of $20-25 per shift, which can be reduced depending on the number of drinks their customers would buy. The Hardware Store's bartenders collect the money for the lap dance rooms and champagne rooms. The champagne room fees were $175 for 30 minutes or $100 for 15 minutes. For each room, the female would keep $125 if the dancer worked for Childs and the club would receive $50. If it were any other female, the dancer would keep $115 and the club would keep the remainder.

25.     Victim 1 stated that once in the champagne rooms, she would negotiate "extras" (commercial sex acts) with the customers and had done so "hundreds of times." She averaged approximately 15 "extras" per week. Although dancers were only supposed to perform "extras" in the champagne rooms, some would provide oral sex to customers in the less-secluded lap dance rooms. To perform oral sex in the lap dance rooms, the dancer would need to get approval from the bartender.

26.     Victim 1 explained that one of the managers at the Hardware Store, Scott Hoeft, was friends with and played fantasy football with Childs. Victim 1 indicated that Childs often would call Hoeft to find out how much Victim 1 drank during her shift and how many champagne rooms she worked. Victim 1 stated that at times when she would speak to Childs, he

7

put her on hold to call Hoeft to make sure Victim 1 was not lying or withholding money from Childs.

27.     Victim 1 noted that on May 14, 2017, she went to her Mother's house to celebrate Mother's Day. Childs continued to call Victim 1 asking where she was. Victim 1 had sent friends messages on Facebook about wanting to leave Childs. Victim 1 believed that Childs had logged into her Facebook account and read the messages. The next day, Victim 1 had five to six shots of alcohol at the Hardware Store before leaving early. Childs told Victim 1 that he had called "Scotty," and learned that Victim 1 had been drinking and had left the club early. Both of these were also violations of Childs' rules and resulted in physical violence to Victim 1.

28.     Victim 1 stated that the cost of extras were openly negotiated on the floor and that Mike Siegel and the bartenders know about the extras taking place in the champagne and lap dance rooms. At times, customers have asked the bartenders to only charge the fee for a lap dance for use of the champagne rooms because they only wanted a "quick blow job." She explained, for example, that a customer could give Hoeft $50 and then only have to pay for the lap dance room instead of the champagne room fee.

29.     Victim 1 also described how dancers who made money from extras would tip the DJ and the bartenders. Victim 1 stated that if dancers and customers overstayed the time limit, bartenders would open the door and walk in on the ongoing sex acts.

30.     Victim 1 also saw a pimp give money to William Siegel to ignore him as he beat one of the dancers on the dance floor. Victim 1 stated that if a pimp paid Mike or Bill Siegel $150 to $200, they would turn a blind eye to any violence.

8

31.     Victim 1 also explained that if she had a problem with a customer not paying the full amount for the negotiated sex act, she would call Childs. In turn, Childs would call Hoeft or one of the Siegels to have the club enforce collection of the amount due from the customer.

32.     Victim 1 stated that most of the dancers at the Hardware Store had a pimp, and it was common for these dancers to show up with bruises.

33.     Victim 1 stated that Abigail Hageny was a dancer and used to do "extras" (perform commercial sex acts) at the Hardware Store. However, after beginning a relationship with Siegel, she only tended bar. Victim 1 stated that another dancer, Pixie, did not have to do extras because she was in a relationship with Bill Siegel, who lived above the club.

**D.      Information provided by Victim 2.**

34.     On March 30, 2018, and on April 10, 2018, I interviewed Victim 2. She corroborated the information provided by Victim 1 regarding how Childs treated his victims and Childs' rules. Victim 2 described how Childs controlled what she ate, what she could drink, and even when she could use the bathroom. Victim 2 also described how starting in September 2015, Childs had forced her to perform commercial sex acts, including at the Hardware Store. Victim 2 provided details of instances in which Childs beat and/or urinated on her for violating his rules. Victim 2 also described how Childs directed her to learn from Jennifer Campbell. Campbell would teach Victim 2 how to negotiate prostitution dates, how much to charge, and what to do in the champagne rooms. Campbell would also report back to Childs as to whether Victim 2 was following his rules.

35.     Victim 2 stated that Childs played poker at the Hardware Store every week. Victim 2 stated that Mike Siegel, his brother (Bill), and Scotty (the bartender/manager) all knew that Childs was a pimp. Victim 2 reported that Childs would specifically check in with the club

9

to verify the number of champagne rooms his girls were doing. Victim 2 also reported that Bill
was present on at least one occasion when Childs hit Victim 2 inside of the club.

**E.      Information provided by Victim 3.**

36.      In August 2018, I spoke with Victim 3. Victim 3 reported that Childs had served
as her pimp for an extended period of time. Victim 3 described Childs' rules and his acts of
physical violence toward her. Victim 3 described twice going to the police for help, and I have
reviewed MPD reports regarding complaints Victim 3 made against Childs. Victim 3 also
described having to go to the hospital after being beaten by Childs.

37.      Victim 3 stated that after the Hardware Store opened, Childs had her work there
most of the time. Victim 3 reported that Siegel and his brother knew Childs from working at
other clubs. Victim 3 stated the Siegels were aware that Childs served as her pimp. Victim 3
stated that Childs once beat her in the locker room at the Hardware Store. Victim 3 stated that
Childs made everyone leave the dressing room in order to beat her; however, she believed Mike
or Bill Siegel were just outside the dressing room, and Scott Hoeft was also working that night.

38.      According to Victim 3, the owners and managers of the Hardware Store employed
a "don't ask/don't tell" policy regarding violent behavior by Childs and other pimps. Victim 3
stated that a majority of dancers at the Hardware Store worked for pimps, and she identified
additional pimps whose girls worked at the club. Victim 3 stated that managers recruited girls
who had pimps because the pimps' control of the dancers resulted in fewer problems at the club.
Victim 3 stated that when the managers of the Hardware Store were drunk, they sometimes
referred to the club as a "brothel." Victim 3 stated that the violence and sex acts were "more
discrete" at other clubs, while "anything went" at the Hardware Store.

10

39.     Victim 3 stated that Scott Hoeft, the manager of the Hardware Store, would have sex in the champagne rooms with her on a weekly basis. Hoeft would ask her about bruises from Childs that Victim 3 had covered with makeup. Victim 3 stated that customers could use an ATM in the club to obtain cash or use credit cards at the bar to get cash back to pay the dancers. Victim 3 stated that Mike Siegel, Bill Siegel, and/or Hoeft would keep a tally of the number of champagne rooms each dancer had done during her shift. Victim 3 stated that the house got a portion of the payment for the room and that every dancer had to pay a percentage of their tips to the bartender.

40.     Victim 3 stated that while she worked at the Hardware Store, Mike Siegel installed cameras in the club that he and Bill Siegel could monitor from the office.

**F.     Information regarding Victim 4.**

41.     On January 5, 2018, Victim 1 told me that she had learned from Childs that he had recruited another female, Victim 4, to prostitute for him. Victim 1 subsequently spoke directly to Victim 4, with whom she already was acquainted. On January 25, 2018, Victim 1 reported that Victim 4 did not like the way Childs was treating her and that Childs made Victim 4 call him "Daddy," a term indicating that he was her pimp.

42.     During the evening of January 26, 2018, Victim 1 called me, noticeably upset. Victim 1 explained that Victim 4 had called her and was extremely distraught because "Scotty" had called Childs to say that Victim 4 was causing problems with other dancers and with the owner of the Hardware Store.

43.     I have verified through phone records that Scott Hoeft called Childs that evening as reported by Victim 1. I also have verified that during the evening of Friday, January 26, 2018, there were 10 communications between Childs' phone and Hoeft's phone [**(920) 988-2231**]. For

11

example, there was a 6-minute call from Hoeft's phone to Childs at 3:53 p.m. There were additional calls from Hoeft's phone (averaging 3 minutes per call) at approximately 5 pm and 7 pm that evening.

44.     During their call on January 27, 2018, Victim 4 told Victim 1 that Childs was sending Campbell to pick up Victim 4 from the Hardware Store. Victim 4 told Victim 1 that Hoeft had called Childs because Hoeft wanted Victim 4 to go on stage, but she insisted she needed a break. Victim 4 told Victim 1 that she was exhausted because Childs was making her work 15-hour days.

45.     Following that phone call, Victim 1 spoke to Childs. Childs said that he was going to try to make Victim 4 stay at the Hardware Store and work if he could. Childs told Victim 1, "I know the bitch is tired, but she needs to make that dough."

46.     After the January 26, 2018 telephone call from Victim 1, I contacted DCSO. Shortly thereafter, a deputy conducted a traffic stop on Childs' vehicle. Victim 4 was identified as Childs' passenger.

47.     On February 3, 2018, I again spoke with Victim 1. Childs had told her that Victim 4 had been drunk at a George Webb's restaurant in Hartford and told two customers that because she gave all her money to Childs, she did not have money for her meal. Childs told Victim 1 that he was going to "kill this bitch." HPD was called to George Webb's because Victim 4 attempted to leave the restaurant without paying for her meal. When Victim 1 had finished speaking with Childs, she anonymously called HPD and reported Childs' threats against Victim 4. Victim 4 was cited for obstruction related to the George Webb incident and taken into custody for a short time.

12

48.     I have confirmed the above events with HPD Detective Richard Thickens. Detective Thickens provided reports indicating HPD also spoke with Childs that evening near the Super 8 Motel.  Childs told police that Victim 4's room was under his name.   Records later confirmed that Childs had rented rooms at the Hartford Super 8 Motel from January 19 through January 27, 2018, and again from January 30 through February 4, 2018.

49.     On February 5, 2018, I again spoke with Victim 1.  Victim 1 reported that Childs and Victim 4 were at a hotel in Madison, Wisconsin.  Childs had told Victim 1 that Victim 4 was working with Jennifer Campbell at a brothel known as the Geisha House in Madison, WI.  Childs planned to stay there until Victim 4 made enough money for them to leave.  Childs told Victim 1 that he was happy he was there so he could watch her at all times.  Childs explained that he had taken Victim 4's phone and had changed his phone number to avoid law enforcement detection. Childs told Victim 1 that his new telephone number was 520-353-XXXX.  Case agents obtained records for this number and verified that it was being used to contact individuals associated with Childs.

50.     Later on February 5, 2018, I again spoke with Victim 1.  Victim 1 stated that Childs had told her that he had to put Victim 4 "in her place."  When Victim 1 asked what that meant, Childs told Victim 1 to "stop being stupid," and that "she knew what that meant."

51.     In February 2018, case agents obtained judicial authorization from the United States District Court for the Eastern District of Wisconsin to intercept and record certain phone calls and text messages.  This resulted in case agents obtaining recordings of calls in which Childs discussed Victim 4.  For example, the following is a transcribed excerpt of a call between Childs and Victim 1 on February 9, 2018, in which Childs discusses having Victim 4 do prostitution dates at the Geisha House in Madison:

13

| Victim 1: | I'm guessing that [Victim 4] gives you everything? |
|---|---|
| Childs: | Oh no questions. [Victim 4]… Religiously. So I'm like okay, she likes the spot in Madison; you know what I'm saying? She doesn't want to leave. Like, now we talking last night, like before I picked her up and she doesn't want to go to Arizona now…to the Ranch. |
| Victim 1: | Huh, really? |
| Childs: | Yeah, she'd rather just stay at the Geisha House. I'm like when you break it down, when you think about it like that… You have… you fuckin' in 100, 200 bucks at the Geisha House. You're not doing that in Madison, I mean Vegas. |
| Victim 1: | Right. |
| Childs: | In Vegas, you're not giving away pussy for 100, 200 bucks. |
| Victim 1: | No, not at all. |
| Childs: | Anyway, you're giving away pussy out there…it's sometimes thousands. |
| Victim 1: | Yep. |
| Childs: | And even if the muthafucka pay a thousand just to fuck, you still get $500 of that. |
| Victim 1: | Right, and it's not like it's a long time either. |
| Childs: | Yeah, and like, [Victim 4] worked a double. She did, like, 13 programs on Wednesday, and that's cool, but that was a double. I mean, like, you fucked 13 people that day. You maybe sucked some, but for the most … 13. If you do 13 programs out at, you get 13 rooms out at the fucking Vegas, you get (unintelligible). |
| Victim 1: | You're looking at 10 Gs. |

52.     In a recorded call between Childs and Victim 1 on February 15, 2018, Childs

explained that he originally had Victim 4 at the Hardware Store but that Campbell had stated that

Childs should put Victim 4 at the Geisha House, where she could make more money and be

watched by Campbell.

14

53.    In addition, on March 31, 2018, the United States Customs & Border Protection Agency (CBP) reviewed Campbell's phone when Campbell was departing the Bahamas. CBP Officers noted texts between Campbell and Abigail Hageny trying to figure out if Victim 1 or Victim 4 had provided law enforcement with the information regarding Childs.

**G.    Information from CW-1.**

54.    In April 2018, I met with Cooperating Witness (CW) 1. CW-1 reported that before 2010 or 2011, she needed a job and began dancing at the Hardware Store. CW-1 later started dating Mike Siegel and resided above the club with him.

55.    CW-1 explained that she had also known Childs for years. CW-1 knew Childs was a pimp and reported that Childs had told her that he was teaching his son, who was under 21, "the ins and outs of the business."

56.    CW-1 would joke with Childs when he was playing poker at the Hardware Store. CW-1 stated that Childs sometimes brought Kendrick Hayden a/k/a Ball with him. Hayden is known to law enforcement as a violent pimp. On one occasion, Hayden overheard CW-1 teasing Childs. Hayden told CW-1 that he did not care who CW-1 was, if she talked to him like that, he would "beat her ass."

57.    I am aware that Dodge County deputies have stopped Childs in the presence of Hayden. On December 12, 2017, deputies performed a traffic stop of a Ford F-150 Pickup truck bearing Illinois plates. The truck was owned by Budget Rental Car. The truck was being driven by Hayden (Ball). Childs, his son (Chris Jr.), and a third individual were passengers in the truck. Hayden stated that the group was on the way home from "Clyman," which is where the Hardware Store is located, and which I know to be common shorthand among witnesses in this case for the Hardware Store. Because none of the individuals were on the rental agreement,

Budget requested that they not be allowed to drive the vehicle. A female named Ramanda then arrived to pick up Childs, Hayden, and the others.

58.     CW-1 reported that Childs treated one of his girls, "Jada" (Jennifer Campbell) well but would beat another of his girls, "Crystal," so badly that she could not work.

59.     CW-1 indicated that for a short time, she was the "house mom" for the girls who worked at the Hardware Store. At another point, Siegel had assigned CW-1 to clean the club. When cleaning the club, CW-1 found soiled condoms "all over" the champagne rooms.

60.     CW-1 reported that Siegel was aware that Childs was a pimp and that his girls were performing sex acts in the champagne rooms. CW-1 said that there was a crack in one of the champagne room doors and that she had seen Campbell performing oral sex on a customer. CW-1 also overheard J.L., one of Campbell's regular customers, offer Campbell $2000 for "bareback" (sexual intercourse without a condom). I have reviewed Campbell's Facebook messages and identified well over a dozen messages in which Campbell and J.L. discussed meeting for prostitution dates in the VIP rooms at the Hardware Store, at a location in Hartford, and at other strip clubs. During one of the messages in August 2015, Campbell encouraged J.L. to meet her at a different club, because "Hardware was just too dirty." I also have reviewed information the FBI extracted from Childs' phone following his arrest on March 29, 2018, and I am aware that J.L.'s full name and two associated phone numbers were saved as a contact in Childs' phone.

61.     CW-1 identified another of Childs' girls as "Selene" or "Chrissy." CW-1 identified a picture of Victim 3 as this individual. CW-1 recalled that Victim 3 often was too bruised up to work and that Childs would call Siegel to report that Victim 3 would not be in to

16

work, sometimes for a week or more. CW-1 saw Childs grab Victim 3 by the arm at the Hardware Store and pull her into the back room crying.

62.     CW-1 stated that Siegel preferred for the club's dancers to have pimps because they made more money for the club. CW-1 reported that both of Siegel's brothers, John and Bill, had worked at the club. However, Siegel fired John because when dancers arrived late, he would demand oral sex in a booth near the bar instead of requiring them to pay the house a late fee.

63.     CW-1 stated that Scott Hoeft was a bartender at the club and that Hoeft would call Childs to let him know when his girls had left of the club early, to go get food or otherwise. Hoeft and Childs became close because they played poker together.

64.     CW-1 also reported that Siegel allowed the dancers to smoke marijuana in the dressing room and would sell marijuana to the dancers. CW-1 recalled that Siegel used to keep a large container of marijuana on his kitchen table.

65.     CW-1 reported that Childs often stayed at the Hardware Store during the course of an evening watching his girls. Childs would smoke with Siegel in the office and in the back of the club. Childs and Siegel often had lengthy conversations. Childs would also call Siegel to order to check how much money his girls made during their shifts and how they were behaving.

66.     CW-1 reported that during their relationship, Siegel was cheating on her with Abigail Hageny, a dancer at the club and cocaine user. After CW-1 left, Siegel moved in with Hageny. CW-1 reported that after she and Siegel separated, Siegel persuaded CW-1 to give up her rights to their son. CW-1 reported that Hageny later adopted CW-1's child with Siegel.

67.     CW-1 reported that after she separated from Siegel, Childs offered to help her with a car payment and tried to get CW-1 to prostitute for him.

17

68.     I have reviewed the records obtained from a search of Childs' Facebook account and identified conversations that corroborate CW-1.  For example, in September 2014, CW-1 asked Childs for financial help.  Childs told her, "You know how to get money."  When CW-1 explained that she would not perform sex acts, Childs replied that "95% of the girls around here get money" from such acts.  Childs then continued to try to recruit CW-1, telling her that she needed his "management."  CW-1 again declined to work for Childs, joking that she instead could become his "understudy" as "a pimp ….lol."  CW-1 also assured Childs, "I understand [in] your line of business you never help in this way… But u need not worry.  No one will ever know u helped.  I swear."  Childs then replied, "I'm use to getting money not giving it."

69.     CW-1 reported that most dancers were paid with envelopes of cash at the end of the night.  Specifically, Scott Hoeft would place the cash in sealed envelopes for each girl.  If the girl worked for Childs, Hoeft would sometimes walk the envelope of cash out to Childs.  CW-1 also reported that the gambling machine money would be placed in a separate envelope.  CW-1 further explained that Siegel personally stocked a condom machine in the women's restroom so that dancers would have protected sexual intercourse when performing such acts in the club.

70.     CW-1 stated that Siegel would cash checks for workers from Seneca Foods (whose plant is located in Clyman).  Some of the workers would spend their entire checks in the club.  CW-1 also reported that Siegel owns the ATM located in the club and fills the machine himself.  CW-1 explained that Siegel would allow customers to make payments at the Hardware Store with a credit card for a fee.

**H.     Information from CW-2.**

71.     In June 2018, DCSO Detective Vickie Brugger spoke with CW-2.  CW-2 reported that she was hired by Scott Hoeft and danced 5 days per week at the Hardware Store between

18

approximately December 2014 and August or September 2015. CW-2 stated that the club had an unspoken "expectation" that dancers would have sex in the champagne rooms. CW-2 described the fees for the champagne rooms and stated that Mike and Bill Siegel directed dancers to customers with money so that the girls could "sweet talk" customers into purchasing champagne room services. CW-2 stated that she averaged $200 for each champagne room (including tips).

72.     CW-2 said that pimps, including Childs, tried to recruit her. CW-2 stated that Childs was at the club weekly. CW-2 indicated that although sex acts were supposed to be limited to the champagne rooms, some dancers performed sex acts in the lower-cost lap dance rooms or would have sex outside of the club for as little as $60. This resulted in fewer customers wanting to spend extra money for the champagne rooms. CW-2 stated that by the end of her tenure at the Hardware Store, there was no point in working weekends because other dancers were providing sexual favors at such a low cost. CW-2 also stated that various individuals, including dancers, sold cocaine at the club.

**I.     Information from CW-3.**

73.     In August 2018, Detective Brugger interviewed CW-3. CW-3 reported that she was a heroin addict and had danced at strip clubs in Dodge County. CW-3 reported that Childs and "Jada" (which I recognize as Campbell's stage name) had tried to convince her to join their "team." Beginning in 2015, CW-3 started working exclusively at the Hardware Store. CW-3 described the Hardware Store as a "dirty" place, stating that the club was "filthy" and essentially operated as a brothel. The first day she worked at the Hardware Store, CW-3 saw a dancer performing oral sex on a customer in the lap dance room, which was separated from the bar area only by strings of beads.

19

74. CW-3 stated that it became difficult to book the champagne rooms because so many dancers were using it for sex acts. CW-3 stated that dancers openly offered sex to customers in front of Scott Hoeft and Bill Siegel. CW-3 also reported that Hoeft would have sex with dancers in the champagne rooms when no customers were in the club.

**J.     Information from S.B.**

75. In April 2018, other case agents interviewed S.B., who had been identified as a long-time prostitution customer of Jennifer Campbell. S.B. indicated that he had met Campbell at the Hardware Store and had been paying her for sex for approximately 4 years. S.B. explained that he would purchase champagne rooms at the Hardware Store so he could have sex with Campbell. S.B. would pay the club approximately $175 for 30 minutes or $250 for an hour to use the rooms. S.B. indicated that there was an additional $10 fee for using a credit card.

76. In addition to paying for sex at the Hardware Store and other clubs, S.B. purchased the residence in which Campbell and Childs resided and purchased a Cadillac for Campbell. Case agents have verified that S.B. is listed as the owner of the residence that had been shared by Childs and Campbell.

**K.     Information from CW-4.**

77. In March and April 2018, case agents interviewed CW-4, who was serving a Huber (work release) sentence in an adjacent county. CW-4 reported that on 4-5 occasions, dancers at the Hardware Store offered him and/or other customers oral sex for $50. CW-4 stated that the oral sex would take place in the "bead rooms," which were visible to other customers in the bar area.

20

**L.    September 20, 2018, prostitution activity at the Hardware Store.**

78.    September 20, 2018, just before 5 p.m., Dodge County Sheriff Dale Schmidt and Deputy Michael Workman entered the Hardware Store to perform a license check. During the check, Sheriff Schmidt's body camera was activated. As Sheriff Schmidt walked to a corner of the bar area, he could see into a room that was separated from the bar only by strings of beads (as had been described by cooperating witnesses above). Through the beads, Sheriff Schmidt could see a female, later identified as S.Q. (age 25), performing oral sex on a male customer, later identified as Joseph Brown (age 64). Brown's pants were unzipped, and his penis was exposed.

79.    When interviewed, S.Q. stated that she had worked at the Hardware Store for 4-5 years. After initial denials, S.Q. explained that Brown had agreed to pay her $100 in exchange for an "extra," namely a blowjob. Brown first paid the club $25 per song for use of the room. S.Q. explained that Brown asked her not to use a condom but she had insisted. S.Q. advised that Brown was still wearing the condom and provided the wrapper to Sheriff Schmidt. S.Q. stated that she was aware that other girls made money by engaging in sex acts at the club.

80.    When interviewed, Brown initially denied that he had paid for oral sex. Brown stated that he has been to the Hardware Store many times and that Scott Hoeft could confirm that he only paid for lap dances – never for a champagne room. Brown also denied that he was wearing a condom. However, when asked what deputies would find when searching him as part of the booking process, Brown admitted he was still wearing the condom and had agreed to pay S.Q. $100 to "give him head." According to Brown, while seated at the bar, he had asked S.Q., "What's the deal with the back rooms?" When S.Q. explained the "deal" with the champagne rooms, Brown replied that the price was way too high. S.Q. asked if he would pay for the lap

21

dance room instead. S.Q. told Brown that she could only do oral sex in the lap dance room, and Brown then paid the bartender for two "dances" in that room.

81. S.Q. and Brown were then arrested for their participation in the prostitution activity taking place on September 20, 2018, at the Hardware Store.

82. Sheriff Schmidt then interviewed Scott Hoeft, who was tending bar. Hoeft stated that what had just happened would be a "huge problem." Hoeft provided his phone number and verified his address in Watertown. When Sheriff Schmidt asked whether he could get the recording from the camera mounted in the lap dance area, Hoeft stated that he did not think there was a camera in that room. When Sheriff Schmidt pointed out that there was a camera on the wall, Hoeft replied that Sheriff Schmidt should talk to the "owner." Hoeft then called Siegel and handed his cell phone to Sheriff Schmidt. Siegel then advised that the camera in the lap dance room could be monitored but does not record.

83. When speaking to Sheriff Schmidt, Scott Hoeft stated that S.Q. should have known better and that Hoeft and others had been checking to make sure prostitution did not happen in the club. Hoeft also verified that Brown had paid the club $50 to use the lap dance room for two songs.

84. On September 28, 2018, Sheriff Schmidt met with Mike Siegel at his request to discuss the September 20 incident and its impact. Siegel used the phone number **(920) 342-7532** when arranging the meeting. During the meeting, which Sheriff Schmidt recorded, Siegel stated that when hiring dancers, he was now uses a questionnaire to check for signs of human trafficking. Siegel added that he planned to start using CCAP to check for prior prostitution arrests. Siegel claimed he fired 11 of his 24 dancers when they did not attend a session on human trafficking conducted on April 12, 2018 by one of the case agents (discussed in detail

22

below).  Siegel also claimed that he had fired another 11 girls since March 2018 after catching them starting to "do things" with customers.

85.    Siegel stated that his business had "dried up" since the publicity following the arrest of Chris Childs.  Siegel gave an example of receipts from private rooms dropping from over $1,000 to $126 per week.  I am aware from financial records obtained from a local bank that the Hardware Store had reported revenues of in excess of $477,000 in 2016 and $451,000 in 2015.  I also am aware that Siegel had reported to the same bank in November 2017 that he earned $125,000 per year in salary and that his net worth was $732,5000.  He also provided his cell phone number as **(414) 870-7730.**

86.    Siegel claimed that Scott Hoeft would have caught and stopped S.Q.'s sex act with Joseph Brown as soon as he was done taking money from another customer.  When Sheriff Schmidt questioned Siegel's claim and commented that perhaps Hoeft was part of the problem, Siegel quickly changed course.  Siegel then indicated that because his business partner, Donald Raffaelli, had expressed the same concerns, Siegel planned to fire Hoeft that night.

87.    During their meeting, Siegel told Sheriff Schmidt that when the license of a rival strip club had been suspended for two weeks, that was not enough of a message to the owner.  As such, Siegel planned to accept whatever suspension was handed out by the Village of Clyman.  Siegel indicated that he wanted to hit the "reset" button and, if suspended, might keep the club closed until Memorial Day.  Siegel also stated that he might change the club to a pizza parlor.  To date, the club has not yet been suspended.

88.    Siegel indicated that he had closed the lap dance room with the beads to prevent acts of prostitution.  Siegel stated that the cameras in the champagne or VIP rooms were active and recording but that the camera in the lap dance room does not record.  Siegel stated that

23

recording the lap dance room seemed unnecessary because anyone who used the bathroom could see what was happening behind the beads. Siegel stated that he could, however, watch the camera from the lap dance room in his office at the club. Siegel further acknowledged that he may have looked the other way at times and stated that he had hunted with guys who would discuss which of the girls at the club were better [in bed].

**M.     Prior prostitution incident at the Hardware Store.**

89.     The September 20, 2018 incident was not the first time law enforcement encountered apparent commercial sexual activity at the club. On November 25, 2017, at 1:05 a.m., Deputy Waas and Sergeant Boeck of the DCSO conducted a license check at the Hardware Store. When attempting to enter one of the champagne rooms, someone pushed the door closed. Deputy Waas and Sergeant Boeck entered the room and found J.H. standing behind the door. His pants and underwear were around his ankles. A dancer, L.R., was in her underwear but wrapped in a towel. J.H. stated that he did not know why his pants were around his ankles and had paid only for a lap dance. J.H. provided a receipt to Deputy Waas showing that he had paid the Hardware Store $138. J.H. stated that he did not know why the lap dance was so expensive.

90.     Deputy Waas then spoke to L.R., who stated that lap dances were typically $25 to $60. When asked why J.H. had paid $138 she stated it was because J.H. wanted a private dance. L.R. stated that J.H.'s pants were off because she wanted to get him aroused. L.R. claimed not to know if customers typically removed their pants and underwear for lap dances. When Deputy Waas advised that it was not legal to take off the customer's clothes, L.R. stated that he should discus that with the owners, because once the door to the private room is closed, the dancers have permission to do "anything." L.R. stated that she did not receive any money and that J.H. had paid for everything at the bar.

24

91.     Deputy Waas then spoke to the bartender working at the time, Joshua Schultz. Schultz stated that he only worked weekends. He said that customers were required to remain clothed and were not allowed to touch the dancer. He stated that the champagne rooms did not have any security cameras but that he checked the champagne rooms throughout the night. Schultz then stated that L.R. was being fired for her conduct.

92.     In December 2017, Detective Brugger made contact with Joshua Schultz regarding the November 2017 incident. Schultz indicated he and Mike Siegel are friends, are in a dart league, and hunt together. Schultz stated that to help Siegel, he bartended on Friday nights and some Saturday nights from 8 pm to 2 am. Schultz stated that he is paid $10 / hour in cash and is not on the payroll. Schultz stated that Hoeft and Bill Siegel are the managers and are present 90% of the time. Schultz stated that Abigail bartends on Saturdays. Schultz stated that he has the authority to fire dancers if "things are happening that shouldn't be going on."

93.     Regarding the incident on November 25, 2017, Schultz stated that the DJ usually collected the lap dance and champagne room fees. However, the DJ was not available. In addition, Hoeft had left. As such, Schultz collected the money for the private rooms that evening. Schultz expressed surprise that J.H. was not wearing his pants because L.R. should have been familiar with club rules. Schultz also stated that the rules posted in the dancers' dressing room made it clear that no "extracurricular activity" was allowed. Schultz also claimed that the club planned to install a new camera system so this type of activity would not happen again. Schultz stated that as of December 2017, one of the lap dance rooms had a camera that could be monitored by the DJ.

94.     On December 20, 2017, Detective Brugger also spoke with Siegel. Siegel stated that by December 23, 2017, all areas would be under video surveillance. The monitor would be

25

visible at the entrance to the club, and Siegel would be able to monitor all areas from his cell phone. Siegel stated that 80% of his customers are locals and try to build rapport with the dancers so they can proposition them. Siegel stated that there was a 3-week period in which the cameras were not operating and the dancers thought they could get away with "stuff."

95.    Siegel described Hoeft, Hageny, Bill Siegel, and Schultz as his "family" and stated that they occasionally meet to discuss "new angles" on how to operate within the law. Siegel stated that his policy was to fire any opiate-addicted dancer or any dancer who offers "more than a dance" to customers. Siegel stated that he fires "25 beautiful girls" each year because of addiction or suspected sexual activity. Siegel stated that the dancers sometimes wear large wigs to hide what they are doing with their heads near customers' lower torsos. Siegel claimed that the club has zero tolerance for any sexual activity.

96.    During his discussion with Detective Brugger, Siegel stated that he was aware of most of the activities in the Hardware Store because when he does the books in the morning, he watches the surveillance tapes from the night before. Siegel claimed that he reviews the tapes from the "whole joint," including the champagne rooms.

**N.    Facebook conversations.**

97.    Information obtained through the execution of search warrants for Facebook records for Childs, Campbell, Victim 1, Victim 2, and Victim 3 also corroborated the statements of the victims and witnesses described above. For example, Childs received and sent photos and memes related to being a pimp, engaged in conversations in which he confirmed that he takes all of the money earned by his victims, discussed his rules, and sought to recruit women. In March 2014, Childs told a woman in a private Facebook conversation that he had been a pimp for more than 18 years.

26

98.     The Facebook materials included communications between Childs and Victim 1

and Victim 2.  Two examples illustrate the content of the Facebook materials:

   a.     In a conversation on August 6, 2016, Childs directed Victim 1 to torture
          herself as "punishment."  Childs told Victim 1 that she must sleep with a
          bottle inserted into her rectum for 3 weeks and that she had a week to force
          her fist into her vagina.  When Victim 1 told Childs that trying to
          stick the bottle into her rectum "hurts so bad," Childs responded, "I want it
          to hurt."

   b.     In a conversation on November 13, 2015, Victim 2 stated that she wanted
          to return Childs' phone and "be done" working for him.  Childs told her,
          "You're not done" and "Don't make me come find you."  Childs stated he
          would never let her leave, noting that he put too much "work and effort
          into you to let you just walk away."  Childs stated that Victim 2 could not
          become a "lost investment" and added, "I'm not gonna let you fuck up my
          plans."  When Victim 2 countered that there was nothing Childs could do,
          Childs replied, "There's a lot I can do and if you'd like me to show you I
          will."  Childs further warned Victim 2 not to "underestimate" him.  Childs
          then asked if Victim 2 wanted to leave because Victim 1 had begun
          working for him.  Victim 2 begged Childs to "replace" her with Victim 1
          and let her leave "peacefully."  Childs stated that he was "getting real
          pissed off" and told Victim 2, "You are my property."

99.     The Facebook records also include conversations between Childs and Campbell

and the Hardware Store, its owners, and employees. For example, on August 13, 2015, Campbell

sent a message to Mike Siegel asking if she could work the following weekend.  Campbell

explained, "Chris already talked to Scottie…Just wanted to make sure it was ok with you."

Siegel responded, "of course it is we love you we miss you."  Siegel added, "you are part of the

hardware store family as far as I'm concerned."  Campbell replied, "Awhhh thank you;)  I will

be in for a double shift tomorrow."

100.    On September 3, 2015, Campbell sent a message to Hoeft asking if he was

working.  Campbell explained that she was thinking of working at the Hardware Store but that

27

the manager of a rival club would give her "shit" if she did so. After Hoeft called the manager of the other club a "dbag," Campbell stated that she would be in after 7 pm.

101.    On September 10, September 17, and September 26, 2015, as well as on April 10, April 21, April 25, May 9, May 23, June 15, and July 7, 2016, Campbell and Hoeft exchanged messages about her schedule. Some of these messages indicate that Victim 1 would be arriving with Campbell.

102.    On June 27, June 29, July 7, July 29, October 3, and November 13, 2016, as well as on January 8 and January 22, 2017, Abigail Hageny and Campbell communicated about Campbell working shifts at the Hardware Store.

103.    The Facebook records suggest that Siegel and Hageny personally sought to arrange dates for Campbell with important customers. In that regard, on July 29, 2016, the following exchange took place between Hageny and Campbell:

> **Author:** Abigail Hageny (762115093)
> **Body:** I meant to ask you last night if you can work Saturday night?

> **Author:** Jennifer Campbell (637350253)
> **Body:** I'm working tonight and Saturday my dear.., do you need day shift girls today? Was thinking about pulling a double

> **Author:** Abigail Hageny (762115093)
> **Body:** It's possible, you can go in at any time you want
>
> Not to long ago Michael set you up with **[redacted]**, his dad **[redacted]** will be in Saturday night, Michael wanted to make sure there was a reliable pretty girl there

> **Author:** Jennifer Campbell (637350253)
> **Body:** Are there a lot of girls working today though? Yes I will be there... Thank you sweetie and tell Michael I said thank you
>
> …

> **Author:** Abigail Hageny (762115093)

28

**Body:**     13 for day

**Author:**     Jennifer Campbell (637350253)
**Body:**     Uggh

**Author:**     Abigail Hageny (762115093)
**Body:**     Yeah ugh

**Author:**     Jennifer Campbell (637350253)
**Body:**     How many white girls? Lol

**Author:**     Abigail Hageny (762115093)

**Body:**     3

Then, on the following Saturday, Campbell apparently was running late for the arranged

date, as the following exchange took place with Siegel:

**Author:**     Jennifer Campbell (637350253)
**Body:**     Hey Mike just wa Ted to let you know I'm running late but on my way

**Author:**     Michael Siegel (100004089017975)
**Body:**     They are there waiting

**Author:**     Jennifer Campbell (637350253)
**Body:**     Almost there ..sorry

104.     The records reveal that Campbell also dealt directly with Siegel when she

believed she had not been paid for the proper number of champagne rooms during a particular

shift:

**Author:**     Jennifer Campbell (637350253)
**Body:**     Hi Mike , sorry to disturb you so late but I was shored by Smokey tonight,,,, I had 2 1/2 hr an hr then another hr then a 1/2 ... So 7 rooms total and only received 575

**Author:**     Jennifer Campbell (637350253)
**Body:**     ,shorted , lol not one to complain, I have been treated very well since I have been back ,this is the first time I have been short on money ,I kake sure I keep track of rooms and dances , again sorry to bug you and complain but way off on payout tonight

**Author:**     Michael Siegel (100004089017975)

29

**Body:**    Don't worry about it Jenny I'll take care of it in the morning I got you
             you can get your money tomorrow

**Author:**  Jennifer Campbell (637350253)
**Body:**    Thank you hon . It was prob lay an accident ... Smokey was tired and just
             wanted to go home

**Author:**  Michael Siegel (100004089017975)
**Body:**    ...look at what you wrote me and what you send me you did to have our
             rooms then a one-hour room then a half an hour room that equals 5 rooms
             which is $575 Smokey said you wanted to do an hour in the end but there
             wasn't enough time that's why you only did a half an hour room at the end
             of the night that's five rooms total which equals $575 I talk to Smokey he
             told me exactly the message you sent to me half an hour half an hour one
             hour half an hour that's five total everything was wrote down the starting
             times ending times I don't think he made a mistake

**Author:**  Michael Siegel (100004089017975)
**Body:**    If you look at the first message you sent me last night your message equals
             5 rooms as well

A search of Childs' Facebook account reveals that approximately 12 minutes after

Siegel's last message in the above chain, Abigail Hageny sent the following message to Childs:

**Author:**  Abigail Hageny (762115093)
**Body:**    Michael wants you to call him please
             **[414-870-7730]**

105.    Between February and December 2014, Hageny and Childs also exchanged a

series of direct messages. In addition to sexual banter, Hageny and Childs discussed whether

Hageny was still dancing at the Hardware Store, when Childs would be at the club, and Childs

playing poker and fantasy football with Scott Hoeft. During one exchange, Childs stated that

Hageny looked normal before going into a back room at the club with a customer but "came

back out about an hour later looking like zombie." In the next message in the thread, Hageny

typed, "Hooker," and Childs responded with "Yes you are." During one exchange, Hageny also

indicated that she was using Scott Hoeft's phone to communicate with Childs.

30

106.    Communications between Childs and Hageny continued into 2015 and included additional sexual banter, references to Hageny dating Siegel, and when Siegel would arrive at the club.  For example, the following exchange occurred in February 2015:

**Author**    Abigail Hageny (762115093)
**Body**      Come visit me, I'm bored. I'll buy you a shot :)

**Author:**   Chris Childs (569171248)
**Body:**     Where are you??

**Author:**   Abigail Hageny (762115093)
**Body:**     The club unfortunately

**Author:**   Chris Childs (569171248)
**Body:**     How are things with Ya mystery boyfriend

**Author:**   Abigail Hageny (762115093)
**Body:**     Lol he's not a mystery anymore, everyone knows surprised it hasn't been rumored to you. Its going great. His names mike :)

**Author:**   Chris Childs (569171248)
**Body:**     Do I know this mike??

**Author**    Abigail Hageny (762115093)
**Body:**     Yep lol

**Author:**   Chris Childs (569171248)
**Body:**     ?????

**Author:**   Abigail Hageny (762115093)
**Body:**     Hahahaha I work for him

**Author:**   Chris Childs (569171248)
**Body:**     My guy mike??

**Author:**   Chris Childs (569171248)
**Body:**     Bills brother??

**Author:**   Abigail Hageny (762115093)
**Body:**     Yes Sir lmao

**Author:**   Chris Childs (569171248)
**Body:**     Gtfoh

31

> ...
> Since when??

**Author:** Abigail Hageny (762115093)
**Body:** Mid Oct

**Author:** Chris Childs (569171248)
**Body:** I gotta be super nice to you now
> ....
> You're like the bosses wife

**Author:** Abigail Hageny (762115093)
**Body:** Hahaha shut up

107. In multiple exchanges in February 2016, when Hageny was scheduling dancers and wanted Victim 2 to work, she contacted Childs rather than Victim 2 directly. Hageny explained that customers were asking or calling about when Victim 2 would be working. Hageny also explained that on one occasion she wanted Victim 2 to work because there was "nice action today." In another exchange in February 2016, Hageny also confirmed to Childs that Victim 2 had arrived.

108. In November 2016, Hageny also alerted Childs that Campbell had not responded to a message that the club had an additional $100 for Campbell to pick up.

109. In February 2017, Childs and Hageny also had an exchange in which Childs was checking on whether Victim 1 was using drugs during their shifts at the Hardware Store:

**Author:** Chris Childs (569171248)
**Body:** Question for you

**Author:** Abigail Hageny (762115093)
**Body:** What can I help you with
> Guessing something with your dramatic girls
> ...
> Idk how you stay sane js

**Author:** Chris Childs (569171248)
**Body:** Lmao

32

**Author:** Chris Childs (569171248)
**Body:** Don't tell [Victim 1] or [Jennifer Campbell] about this conversation
...
But have you heard anything about [Victim 1] doing drugs??

**Author:** Abigail Hageny (762115093)
**Body:** Girls suspect it

**Author:** Chris Childs (569171248)
**Body:** What have you heard.....I want to get to the bottom of this

**Author:** Abigail Hageny (762115093)
**Body:** Give her a random drug test 😊 jj
She went into the bathroom one day and when she walked out she wasn't standing well, falling over
That's the only story otherwise all the gossiping bitches were sitting in the back one day saying she hasn't been right n how they think she's on drugs. I did agree with the bitches that it was possible for the fact that one Friday night I was in the club and when she saw me she was bitchy to me, dirty looks, didn't want to talk, cocked her head and looked at me head to toe and walked away when I asked how she was doing, just not a normal [Victim 1] and it didn't seem like she had been drinking. But I don't know, I can't say one way or another if she does or doesn't, only thing I know for sure for sure is she loves her booze

**O.     Information from post-arrest search of Childs' phone.**

110.    Following his arrest on March 29, 2018, the FBI downloaded the content of Childs' cell phone. Among the contacts saved in Childs' phone were:

    a.     "Scotty" with a listed mobile number of **(920) 988-2231;**

    b.     **"Mike (Hardware)"** with a listed mobile number of **(414) 870-7730;** and

    c.     "Annabell (Hardware)" with a listed Facebook ID of "amhageny."

111.    An analysis of Childs' phone showed 150 contacts with Hoeft, and 8 contacts with Siegel. The phone also contained Facebook messenger communications between Childs and Hageny, including conversations described above in Paragraphs 107 and 109.

33

112.    Childs' phone also contained messages between Campbell and Childs in January

2017, in which they appeared to discuss whether Siegel had agreed to prevent an unknown

individual from working at the Hardware Store. Campbell reported to Childs, "If you want her

gone, she's gone," but she added that Siegel was in Las Vegas and needed to hear the request

directly from Childs. When Childs asked Campbell what Siegel had said, she responded, "Call

mike he has to hear it from you."

113.    Childs' phone also contained hundreds of communications between Childs and

Campbell, Victim, and/or Victim 2 regarding the Hardware Store. For example, on February 27,

2017, Victim 1 sent Childs a message indicating, "Mike just called me from Abby's phone.

Because I tried calling her to let her know that I was only gonna work dayshift. And then Mike

called me back."

114.    In addition, in March 2017, Victim 1 sent Childs a message complaining that

Hoeft was allowing other dancers to provide oral sex in the lap dance rooms, which I am aware

cost less to reserve than the champagne rooms. Victim 1 wrote, "Scotty is gonna get a punch to

the throat, along with these other stupid cheap ass hoes. Time to suck dick in the lap dance room

I guess." Victim 1 adds, "... And he's letting it happen." Childs responded, "Yep. Scotty

doesn't give a shit what goes on as long as they don't fight." Victim 1 then informed Childs,

"I'm not gonna stoop to their level. Fuck them. I'll just start recording shit and showing it to Bill

[Siegel]."

115.    In another series of messages on Childs' phone, on June 19, 2017, a dancer (using

a number ending in 9944) reported to Childs that a customer had just raped her in a champagne

room at the Hardware Store. The female explained that when she told her customer that he

would have to pay an additional fee for sex, the customer stated that he already paid $100 for the

34

room and was going to have sex. The female reported that the customer covered her mouth, raped her, and did not use a condom. The female reported that she was swinging at the customer and was unable to reach a knife she kept in her purse. She explained that when the customer finished and let her up, she yelled and Abigail Hageny came running into the room. The customer then ran out of the club. Childs advised the female that because the customer did not use a condom, she had "better hit the clinic." The female asked Childs to help her figure out where the rapist lived and sent Childs the name and a picture of her assailant.

116. Childs' phone also contained messages between Childs and Victim 4 in January and February 2018, in which Victim 4 provided Childs updates with how many "extras" or "programs" she had done at the Hardware Store and (later) at the Geisha House and how much money she had received. For example, on January 19, 2018, Victim 4 was working at the Hardware Store. At 7:25 pm, she advised Childs that she "Got a room." Childs responded, "Good girl." At 7:33 p.m., Victim 4 advised that she was "Done already" and made $125. Childs replied, "Nice." At 7:39 pm, Victim 4 advised that she had secured another room for another $125. When Childs asked at 7:42 p.m., whether she done any extras in the rooms, Victim 4 responded, "Yes…Protected n quick." A series of similar exchanges took place throughout the evening in which Victim 4 advised Childs when she had rooms and what she had made in fees and tips. After Victim 4 had completed four champagne room dates in less than 2 hours, Childs sent a message to Hoeft stating, "Yo, how's [Victim 4] doing?" Hoeft replied, "She's doing decent." Childs responded, "Ok cool."

117. In addition, on February 1, 2018, Hoeft and Childs discussed Victim 4 in a series of messages. After Hoeft asked Childs if Victim 4 could work at Siegel's club in Juneau instead of the Hardware Store that evening, Childs replied, "I think Hardware's gonna be better then

35

Juneau and I need the bread." Hoeft responded, "Ok...well she should probably try n work then instead of trying to smoke weed." When Childs explained that Victim 4 was "Still a work in progress" and asked if she could be allowed to smoke at the club. Hoeft responded that it was "hard enough keeping the girls in line and that the other girls would think they could get away with things. Hoeft stated the result would be a "circus." Hoeft then explained that if Victim 4 worked a double shift, she could get a break at 7 p.m., so Childs should "just try n have her hold out till then." Childs indicated that he would tell Victim 4 that she could not smoke marijuana until her break.

**P.     Crime stoppers tip regarding Scott Hoeft.**

118.    On September 22, 2018, an individual made an anonymous tip on a CrimeStoppers website identifying Scott Hoeft as being involved in "ongoing" prostitution activity. The tipster provided accurate address and phone number information for Hoeft, including that Hoeft's cellular phone number is **(920) 988-2231.** The tipster reported that Hoeft was the manager of the Hardware Store and has a safe in the closet of the spare room in his house at 1021 Richards Avenue in Watertown. The tipster reported that the safe is used to store cash earned "under the table." The tipster reported that last fall, Hoeft had texted about a new white girl who was bringing in business in the back room of the Hardware Store. The tipster stated that Hoeft texted that this was one of Childs' girls. The tipster reported that Hoeft uses text messages and Facebook Messenger to communicate.

**Q.     April 12, 2018, Meeting with Siegel.**

119.    The arrest of Christopher Childs on March 29, 2018, generated negative media attention for the Hardware Store. After the media began reporting about the Hardware Store, Siegel contacted the Dodge County Sheriff's Office and asked if law enforcement could provide

36

training regarding how to look for signs of human trafficking. In response to this request, Detective Brugger and S/A Brooks Abramson from the Department of Labor, Office of Inspector General, visited the Hardware Store on April 12, 2018. S/A Abramson wore a recording device to this meeting and mentioned to Siegel that lying to a federal agent was a crime.

120. During the April 12, 2018 meeting, Siegel stated that he had reviewed the criminal complaint against Childs. Siegel stated that he had no idea that Childs was a pimp. Although Childs played poker at the club every week, he never mentioned anything about pimping or prostitution. Siegel stated that Childs simply had a series of girlfriends who worked at the club over the years. Siegel identified Campbell and Victim 1 as two women who had dated Childs. Siegel claimed that Childs never called the club to check on girls. Siegel also stated that the Hardware Store did not pay the girls with sealed envelopes of cash as described in the Childs complaint. Siegel stated that Childs manipulated others by falsely claiming to have a close relationship with the Hardware Store and its employees and owners.

121. Siegel stated that although he never noticed any problems, he planned to get rid of the VIP/champagne rooms. Siegel indicated he would remove the doors to make the rooms less private. Siegel stated that there are cameras in the Hardware Store that were not monitored live but which went directly to DVRs. Siegel stated that the cameras were installed approximately 6 months ago and were on 7-day loops.

122. Siegel stated that his team generally consisted of himself, his brother, his wife, and Scott Hoeft, all of whom had been together for years. Siegel stated that he used to work at Rickey's On State (a strip club in Milwaukee) for Don Raffaelli, who became his partner in the Hardware Store and in a strip club in Juneau. Siegel stated that he only owns 18% of the Hardware Store and that Raffaelli owns the rest.

37

123.    Siegel described how the bar tracked payments due to the dancers, who do not receive W-2s or 1099s.  Siegel stated that a sheet is kept at the bar listing who is working.  That sheet is then used to tally the lap dances and private rooms each girl does during her shift.  Siegel stated that the customers pay the bartender for the use of the rooms.  He gave an example of a $175 fee for a champagne room.  The customer would pay the bar $175.  The bartender would then ring up $60 on the tape for the cash register – as the remaining $115 would be paid to the dancer.  The sheet also would include the number of drinks customers bought for dancers, as each drink reduced the dancer's "tip out" fee that needed to be paid to the club.

124.    Siegel stated that he would visit the club each morning to review the sheet from the night before.  He would then enter the numbers from the sheet into his phone and text or email them to Raffaelli, who in turn conveyed the totals to their accountant.   Siegel stated that he has the nightly totals for the last 1-2 years saved in his phone.

125.    Siegel stated that when the club hires a new dancer, the bartender takes a picture of the dancer with her drivers license or identification card and then emails it to Siegel, who maintains the photos on his phone.

126.    Near the end of the meeting, Detective Brugger mentioned that she saw a condom machine in the women's bathroom of the club.  Siegel professed not to know much about the machine but agreed that the machine would appear to encourage sexual activity.  Siegel stated that on a few occasions, he had placed quarters in the machine and condoms came out.  Siegel claimed that machine was owned by a third party, but neither Siegel nor his brother knew the name of the "condom guy."  Siegel stated that the "condom guy" seemed to show up about every 3 months and would leave $50 in quarters on the bar.  Siegel stated that $50 would buy 100

38

condoms from the machine. Siegel stated that he might have a "slip" from the condom guy but did not locate it while the agents were present.

**R.    Information from Cooperating Witness 5 (CW-5).**

127.    On October 16, 2018, I spoke with CW-5. CW-5 was a frequent customer of the Hardware Store and a former customer of Victim 1. CW-5 believed that Mike Siegel recruited female dancers from his other strip club, Rickey's On State, located in Milwaukee, and from a strip club located in Baraboo, Wisconsin, to work at the Hardware Store.

128.    CW-5 stated that Rickey's On State was not frequently monitored by law enforcement. CW-5 was sure that prostitution occurred at Rickey's On State as frequently as at the Hardware Store.

129.    CW-5 also had spoken with a bouncer at another strip club frequented by CW-5. This individual told CW-5 that while visiting Rickey's On State, he had openly been offered oral sex in exchange for $20.

130.    CW-5 could not directly say that Siegel was aware of the prostitution occurring inside of the Hardware Store. However, CW-5 stated that prostitution was so blatant at the Hardware Store that dancers would grab male customers' genitals as soon as they walked in and offer sexual acts at the bar.

**IV.    Phone information.**

131.    As explained above, the investigation has revealed that Siegel, Hoeft, and others use their cellular phones to communicate with each other directly and through services such as Facebook messenger regarding legal and illegal activities going on at the Hardware Store. In addition, Siegel and Hoeft store information regarding club employees in their phones.

39

132.    I also am aware that the FBI has sent preservation letters to Verizon, AT&T

Mobility, and U.S. Cellular for all records related to **(920) 342-7532, (414) 870-7730,** and **(920)**

**988-2231.**

133.    I am aware that Verizon, AT&T Mobility, and U.S. Cellular all provide cellular

telephone access to the general public, and that stored electronic communications, including

retrieved and unretrieved voicemail, text, and multimedia messages, may be located on the

computers of these providers.  Further, I am aware that computers located at these providers

contain information and other stored electronic communications belonging to unrelated third

parties.

134.    Wireless phone providers often provide their subscribers with voicemail services.

In general, a provider will store voicemail messages on behalf of a particular subscriber until the

subscriber deletes the voicemail.  If the subscriber does not delete the message, the message may

remain in the system of AT&T Mobility, U.S. Cellular, or Verizon for weeks or months.

135.    Among the services commonly offered by wireless phone providers is the

capacity to send SMS or MMS messages (photos, audio, or video) from one subscriber's phone

or wireless device to another phone or wireless device via one or more wireless providers.  Based

on my knowledge and experience, I know that stored electronic communications, including SMS

and MMS messages that have been sent or received by subscribers, are stored by providers for

short periods incident to and following their transmission.  In addition, providers occasionally

retain printouts from original storage of text messages for a particular subscriber's account.

136.    Wireless phone providers typically retain certain transactional information about

the use of each telephone, voicemail, and text-messaging account on their systems.  This

information can include log files and messaging logs showing all activity on the account, such as

40

local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or e-mail addresses associated with particular telephone calls, voicemail messages, and text or multimedia messages. Providers may also have information about the dates, times, and methods of connecting associated with every communication in which a particular cellular device was involved.

137. Wireless providers may also retain text-messaging logs that include specific information about text and multimedia messages sent or received. A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received. The provider could have this information because each cellular device has one or more unique identifiers embedded inside it. Depending upon the network and device, the embedded identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI"). When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers as a matter of course.

138. Many wireless providers retain information about the location in which a particular communication was transmitted or received. This information can include data about which cell towers received a radio signal from the cellular device and thereby transmitted or received the communication in question.

139. Wireless providers also maintain business records and subscriber information. his could include names and addresses, the address to which any equipment was shipped, the date on

41

which the account was opened, the length and types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, and all telephone numbers and other identifiers associated with the account. In addition, wireless providers typically retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the means and source of payment (including any credit card or bank account number).

140. In some cases, subscribers may communicate directly with a wireless provider about issues relating to the account. Wireless providers typically retain records about such communications.

141. I am aware that information stored at the wireless provider, including that described above, may provide evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation. In my training and experience, the data pertaining to a particular cellular device that is retained by a wireless provider can show how and when the cellular device and associated cellular service were accessed or used. Such "timeline" information allows investigators to understand the chronological context of cellular device usage, account access, and events relating to the crime under investigation. Additionally, information stored by the wireless provider may indicate the geographic location of the cellular device and user at a particular time (e.g., historic cell-site location information; location integrated into an image or video sent via text message to include both metadata and the physical location displayed in an image or video).

## V. Conclusion.

142. Based on the information set forth above, I respectfully submit that this affidavit establishes probable cause for the issuance of the requested warrants.

42

**Attachment A**
(U.S. Cellular)

**Premises to Be Searched**

Records concerning a cellular telephone account for phone number **(920) 988-2231**, stored at premises owned, maintained, controlled, or operated by U.S. Cellular, a company headquartered at 8410 Bryn Mawr Avenue, Suite 800, Chicago, Illinois.

**Attachment B**
**(U.S. Cellular)**

## I.     Records and Other Information to Be Disclosed

To the extent that the account described in Attachment A is within the possession, custody, or control of the Provider, including any deleted messages, records, files, logs, or information still available to the Provider, the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

1. All contact and personal identifying information, including full name, birth date, gender, contact e-mail addresses, alternate phone numbers, physical address (including city, state and zip code), and other personal identifiers;

2. Local and long distance telephone connection detail records;

3. Length of service (including start date) and types of service utilized;

4. Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"), Mobile Identification Numbers ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), International Mobile Subscriber Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI"));

5. Means and source of payment for such service (including any credit card or bank account number) and billing records; and

6. The **contents of all stored communications** associated with the account, including stored or preserved copies of voicemails and/or text messages sent to and from the account, the source and destination addresses associated with each voicemail or text message, and the date and time at which each voicemail or text message was sent or received.

## II.     Evidence to Be Seized by the Government

All information described above in Section I that constitutes evidence, instrumentalities, information, records, and/or contraband relating to violations of Title 18, United States Code, Sections 1591 (sex trafficking); 1594 (conspiracy to engage in sex trafficking); 1952 (use of facility in interstate commerce to promote, manage, or carry on unlawful prostitution activity); and 1956 (money laundering), including:

1. Any stored electronic communications, including text messages, instant messages, and voicemails, concerning the operations of the Hardware Store, including the hiring, firing, or scheduling of dancers, nightly revenues, amounts that dancers had earned at or were owed by the Hardware Store, communications with customers,

negotiations with dancers' "handlers" or "pimps," stocking and servicing of the condom machine, the weekly poker game, and other club-related business, activities, or events, whether legal or illegal;

2. Evidence of the disposition or use of proceeds from the above offenses;

3. Evidence of user attribution, showing who used or owned the devices at the time the records and communications described in this warrant were created or occurred; and

4. Evidence indicating the account holder's state of mind as it relates to the crimes under investigation.

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage and any photographic form.